RIEMER & ASSOCIATES LLC
Attorneys for Plaintiff
60 East 42nd Street, Suite 1750
New York, New York 10165
(212) 297-0700
sriemer@riemerlawfirm.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
LINDA GOTTLIEB, Individually and as                     15 CV 04763  (_____)
Executrix of the Estate of
Marc S. Gottlieb, Deceased,

                                Plaintiff,                **COMPLAINT**

        -against-

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

                               Defendant.
---------------------------------------------------------------X

        Plaintiff Linda Gottlieb, individually and as executrix of the estate of Marc S. Gottlieb, deceased, by her attorneys Riemer & Associates LLC, complaining of defendant Hartford Life and Accident Insurance Company ("Hartford") alleges:

        1.      This is an action arising under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.,* to recover benefits due under an employee benefit plan and to recover attorney fees and costs.

        2.      This Court has subject matter jurisdiction pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.  Under Section 502(f) of ERISA, 29 U.S.C. § 1132(f), this Court has jurisdiction without respect to the amount in controversy or the citizenship of the parties.

        3.      Venue is properly in this district pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), in that the Plan as hereinafter defined is administered in this district and the

defendant resides or may be found in this district.

## BACKGROUND INFORMATION ON GOTTLIEB
## AND THE LIFE AND LTD PLANS

      4.    At all relevant times, Plaintiff's deceased husband, Marc S. Gottlieb ("Gottlieb"), was a participant within the meaning of Section 3(7) of ERISA, 29 U.S.C. § 1002(7), in the Group Life and Supplement Life Plan for the employees of St. Jude Medical, Inc. (the "Life Plan") and the Group Long Term Disability Plan for the employees of St. Jude Medical, Inc. (the "LTD Plan").

      5.    At all relevant time, Plaintiff was designated as a beneficiary to the benefits under the Life Plan within the meaning of Section 3(8) of ERISA, 29 U.S.C. § 1002(8).

      6.    At all relevant times, the Life and LTD Plans are and have been an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

      7.    At all relevant times, Hartford is and has been the claims administrator of the Life and LTD Plans within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. § 1002(16)(A); and is and has been a fiduciary under the Life and LTD Plans within the meaning of Section 3(21) of ERISA, 29 U.S.C. § 1002(21).

      8.    The benefits under the Life Plan are funded pursuant to Group Policy No. GL-674244 issued by Hartford ("Life Policy").

      9.    The benefits under the LTD Plan are funded pursuant to Group Policy No. GLT-674244 issued by Hartford ("LTD Policy").

      10.    Gottlieb was employed as a Sales Representative at St. Jude Medical, Inc. ("St. Jude").

      11.    As an employee of St. Jude, Gottlieb was provided with life insurance and long term disability ("LTD") insurance coverage under the Life and LTD Policies, respectively.

12.     Gottlieb designated Plaintiff, his wife, as the beneficiary of his benefits under the Life Plan.

13.     Gottlieb died of pancreatic cancer on September 18, 2014 at the age of fifty-nine (59).  A copy of Gottlieb's Certificate of Death is attached as **EXHIBIT A**.

<u>THE ADMINISTRATIVE PROCESS</u>

14.     Gottlieb suffered from a history of lower back pain since 2002.

15.     In or about October 2003, Gottlieb began treating with Arnold Schwartz, M.D., orthopedic surgeon, due to his persisting lower back pain.

16.     Despite undergoing treatment, Gottlieb continued to suffer from lower back pain with the onset of severe radiating pain into his lower extremities.

17.     Gottlieb pursued additional treatment modalities at the medical advice of Dr. Schwartz, including steroid injections and physical therapy.

18.     Due to the continued progression in Gottlieb's symptoms, Dr. Schwartz resorted to invasive surgical procedures in an effort to alleviate Gottlieb's severe lower back and lower extremity pain.

19.     On or about December 12, 2006, Gottlieb underwent an MRI, which was positive for a herniated disc at right L5-S1.

20.     On or about December 19, 2006, Gottlieb underwent L5-S1 discectomy performed by Dr. Schwartz.

21.     Due to recurrent L5-S1 disc herniation, Gottlieb underwent emergency surgery for a second discectomy performed by Dr. Schwartz on or about December 31, 2006.

22.     Gottlieb's condition improved following the surgeries and he returned to work.

3

23.     The improvement proved to be temporary.   Gottlieb returned to Dr. Schwartz for continued treatment due to recurrent past symptoms, including severe lower back pain and pain radiating into his lower extremities.

24.     On or about August 20, 2007, Gottlieb underwent a CT scan of the lumbar spine, which revealed abnormal findings of:  disc bulges at L1-L2 through L4-L5; mild central stenosis at L4-L5; small superimposed right foraminal disc herniation at L2-L3; right paracentral disc herniation at L5-S1 which compresses the ventral thecal sac and exiting right S1 nerve root.

25.     On or about August 31, 2007, Gottlieb last reported to work at St. Jude.

26.     Heeding Dr. Schwartz' medical advice, Gottlieb underwent a lumbar spinal fusion on or about September 4, 2007, which required the insertion of hardware.

27.     Dr. Schwartz documented Gottlieb's post-operative diagnoses as:  recurrent herniated disk right L5-S1; foraminal stenosis, left L5-S1; degenerative disk disease, L5-S1.

28.     On or about November 5, 2007, Gottlieb underwent a post-surgery CT scan of the lumbar spine post-surgery, which continued to reveal abnormal findings:  "probable small herniation left foraminally and left paracentrally at L4-5.   Does the patient have any radicular symptoms in the left lower extremity?  This may represent a new herniated disc."

29.     Gottlieb was unable to return to work following the lumbar fusion due to his persisting symptoms despite undergoing physical therapy and management of pain and anti-inflammatory medications.

*Hartford's Approval of Gottlieb's LTD Benefits*

30.     Gottlieb filed a claim for LTD benefits with a disability onset date of September 4, 2007 due to his persisting symptoms of severe lower back pain and pain radiating into his lower extremities despite undergoing three invasive surgeries and exhausting conservative

treatment modalities.

31.     The LTD Policy defines "Disability or Disabled" as:

**Disability or Disabled** means that during the Elimination Period and for the next 24 month(s) you are prevented by:
1.  accidental bodily injury;
2.  sickness;
3.  Mental Illness;
4.  Substance Abuse; or
5.  pregnancy,
from performing one or more of the Essential Duties of Your Occupation, or a reasonable alternative offered to you by the Employer, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.

After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.

32.     On or about November 29, 2007, Hartford approved Gottlieb's LTD claim and paid benefits effective December 4, 2007 (after satisfying the Elimination Period) under the "Your Occupation" definition of disability.

33.     On or about December 4, 2009, the definition of disability changed from "Your Occupation" to "Any Occupation."

34.     The LTD Policy defines "Any Occupation" as:

[. . .A]n occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance.

35.     Hartford continued to pay Gottlieb his LTD benefits under the "Any Occupation" standard of disability for nearly five (5) years until he died on September 18, 2014 due to pancreatic cancer.

*Hartford's Approval of Gottlieb's WOP Benefits*

36.     On or about May 28, 2008, Hartford informed Gottlieb that he may be

eligible for Waiver of Premium benefits under the Life Policy based on the medical information submitted in support of his LTD claim.

37.     The Life Policy defines "Disabled" as:

Disabled means that You have a condition that prevents You from doing any work for which You are or could become qualified by education, training or experience and it is expected that this condition will last for at least nine consecutive months from Your last day of work as an Active Full-time Employee; or You have been diagnosed with a life expectancy of 12 months or less.

38.     On or about July 31, 2008, Brenda Whilby, Senior Examiner, informed Gottlieb of Hartford's determination to approve his Waiver of Premium benefits under the terms of the Life Policy effective June 3, 2008.

39.     Hartford informed Gottlieb that he was entitled to the following benefits under the terms of the Life Policy:  $500,000.00 basic benefit; $250,000.00 supplemental benefit; $10,000.00 dependent spouse benefit; and $2,500.00 for each dependent child.

40.     Hartford's internal notes through May 4, 2011 supported that Gottlieb satisfied the definition of "Disabled" under the Life Policy based on the restrictions and limitations assessed by Dr. Schwartz.

_Fully Favorable Determination by the Social Security Administration_

41.     On or about December 15, 2008, the Social Security Administration ("SSA") determined that Gottlieb to be totally disabled with a disability onset date of September 4, 2007.

42.     The SSA determined Gottlieb was disabled from not only his past work, but from performing any work in the National Economy, which is necessarily equivalent to the definition of disability under the Life Policy.

_Claims Investigations Unit ("CIU")_

43.     On or about September 17, 2011, Gottlieb's LTD claim was referred to the

Claims Investigations Unit ("CIU") to Jonathan Dennis, Hartford's Investigative Analyst.

44.    Hartford's referral of Gottlieb's LTD claim to the CIU was based on a mere internet search associating Gottlieb with a possible business, Balco Industries.

45.    Hartford launched an "all-points" investigation of Gottlieb's LTD claim consisting of the following:  video surveillance; interview with Hartford's investigator; file reviews by Medical Case Managers; medical examination; and vocational reviews by Rehabilitation Case Managers.

Surveillance

46.    Hartford retained ICS Merrill to spy on Gottlieb for 4 days (September 28-29, 2011; November 18-19, 2011) for over 40 hours, which is equivalent to 1 complete 40-hour workweek.

47.    Gottlieb was not observed engaged in any "activities" on November 19, 2011.

48.    Despite the extensive surveillance, ICS Merrill merely obtained less than 24 minutes of actual video footage.

49.    Gottlieb's observed "activities" were not inconsistent with his disabling conditions and/or Dr. Schwartz' assessment of his functional capacity.

50.    The ICS Merrill investigator incorrectly determined that Gottlieb was observed "walking at a steady pace with no apparent difficulty or assistive walking devices of any kind," but the investigator is not medically qualified to evaluate Gottlieb's physical and/or functional ability.

Interview with Hartford's Investigator

51.    On or about January 4, 2012,[1] Gottlieb presented to Hartford's investigator, Patrick Dowling, for a recorded interview, where he was inquired about his treating physicians, mediations, treatment, restrictions and limitations, functionality, activities, work, personal and financial information, and the surveillance obtained by Hartford.

52.    Investigator Dowling inquired Gottlieb regarding his affiliation with Balco Industries.

53.    Gottlieb stated that he had no knowledge of Balco Industries and further denied any affiliation with the entity.

54.    Investigator Dowling also inquired Gottlieb regarding the surveillance obtained by Hartford and reviewed select excerpts of the video footage with him.

55.    Gottlieb confirmed that he was observed on the front porch of his residence on September 28, 2011.

56.    Gottlieb further confirmed that he was observed driving his car and also on his friend's boat on September 29, 2011.

57.    Gottlieb explained that he was on his friend's boat to help assess whether a light bulb was properly working.

File Reviews by Hartford's Medical Case Managers ("MCM")

58.    On or about February 9, 2012, the Hartford's internal note documents that Mr. Dennis discussed Gottlieb's medical records with MCM Behrle.

59.    The claim file does not contain documentation of the alleged discussion that occurred between Mr. Dennis and MCM Behrle.

---

[1] The interview by Investigator Dowling was conducted on January 4, 2012, not 2011.

60.     The claim file contains documentation that Gottlieb's claim file was referred to an MCM, but it is unclear whether Gottlieb's claim file was referred to MCM Behrle or another MCM.

61.     On or about February 28, 2012, Julie Wigington, RN, Hartford's Medical Case Manager, requested Dr. Schwartz to provide his opinion as to whether or not Gottlieb was able to function at the sedentary level and enclosed and enclosed the surveillance obtained by Hartford and a transcript of Gottlieb's 1/4/12 interview with Investigator Dowling.

62.     The claim file does not contain documentation of whether Nurse Wigington was the MCM who completed a file review of Gottlieb's medical records.

63.     On or about March 12, 2012, Dr. Schwartz responded to Nurse Wigington's 2/28/12 request for clarification of Gottlieb's functionality.

64.     Dr. Schwartz unequivocally opined that Gottlieb could not perform work at the sedentary level noting "[h]e is unable to sit/stand/walk without significant pain for any prolonged periods of time.  If he does, it sets him back significantly into his pain cycle."

65.     Dr. Schwartz further opined that "[i]ncreased activity causes exacerbations necessitating steroids and other medications to help alleviate his symptoms."

66.     The claim file does not contain a copy of the aforementioned MCM reviews.

Medical Examination by Samuel P. Thampi, M.D.

67.     Hartford's internal note, dated May 8, 2012, documents that Gottlieb's claim file was initially referred to Jeffrey Perry, M.D., Physical Medicine & Rehabilitation, for a medical examination on May 30, 2012.

68.     The medical examination was rescheduled and reassigned to another provider, but the claim file does not contain an explanation for the reassignment.

69.     On or about May 24, 2012, Gottlieb presented to Samuel Thampi, M.D., Interventional Pain Specialist, for a medical examination at the behest of Hartford.

70.     Gottlieb was accompanied by his wife, Plaintiff, in her capacity as a Nurse Practitioner.

71.     Dr. Thampi's examination of Gottlieb lasted a mere fifteen (15) minutes in duration consisting of:  a three to five (3-5) minute review of his medical history; a five (5) minute discussion regarding his past work as a sales representative for St. Jude; and a five (5) minute physical examination of his range of motion and select manipulations.

72.     Dr. Thampi noted his impression of Gottlieb's conditions as follows:  lumbar radiculopathy; lumbar L5-S1 fusion; and postlaminectomy syndrome.

73.     Dr. Thampi acknowledged the following abnormal findings on physical examination:  lumbar facet joint line tenderness and sacroiliac joint tenderness bilaterally; positive straight leg raise bilaterally; decreased sensation in the right L5 dermatome.

74.     Despite the abnormal findings on physical examination, Dr. Thampi assessed Gottlieb's restrictions and limitations as follows:

> The claimant has the capacity to work with the following restrictions: Transition from standing to sitting as needed or vice versa after standing/sitting continuously for about 30 minutes.  The total sitting time will be up to about six hours in an eight hour day.  Standing time will be up to about four hours in an eight hour day and walking time will be total about four hours in an eight hour day.  Lifting, carrying pulling and pushing will be limited to 10 pounds on an occasional basis and 5 pounds on a frequent basis.  Reaching above the shoulder level is unlimited and reaching at the shoulder level is unlimited.  The claimant has no restrictions of upper extremity activities and no limitation of fine motor activity of the hands.

75.     Dr. Thampi specifically noted that "the duration of such limitation is three months, at which time he will require a reevaluation."

76.     Dr. Thampi's report of the 5/24/12 examination is replete with factual

errors.

77.     Dr. Thampi incorrectly notes Gottlieb's medical history to be "unremarkable" despite his need for three invasive surgical procedures for his severe back pain and pain radiating into his lower extremities.

78.     Dr. Thampi incorrectly notes that Gottlieb underwent his second lumbar discectomy in "11/2007", as opposed to December 2006.

79.     Dr. Thampi also incorrectly notes that Gottlieb underwent lumbar spinal fusion in "7/2007", as opposed to September 2007.

80.     Dr. Thampi placed undue reliance on the surveillance obtained by Hartford.

81.     There is reason to question whether Dr. Thampi reviewed the actual video footage of the surveillance obtained by Hartford, as opposed to the mere reports, because he indicates Gottlieb was observed on September 21, 2011.

82.     Hartford did not place Gottlieb under surveillance on September 21, 2011.

83.     On or about June 4, 2012, Nurse Wigington provided Dr. Schwartz with a copy of Dr. Thampi's report of the 5/24/12 examination and requested him to comment on Dr. Thampi's conclusion.

84.     On or about June 28, 2012, Dr. Schwartz responded to Nurse Wigington's 6/4/12 request, where he indicated:  "I disagree with Dr. Th[a]mpi's IME.  Enclosed are my notes for Mr. Gottlieb's last two office visits.  He is 100% disabled from his job.  Any questions please do not hesitate to get in touch with me."

85.     In the June 11, 2012 and March 12, 2012 office visit notes, Dr. Schwartz documents abnormal physical examination findings and his unequivocal medical opinion that Gottlieb remained unable to work—even at a reduced capacity.

11

<u>Hartford's Vocational Review Supports Gottlieb's Continuing Disability</u>

86.     Hartford's internal note, dated July 29, 2011, documents that Gottlieb's claim file was referred to a Rehabilitative Case Manager on or about July 19, 2012 for an Employability Analysis Report ("EAR").

87.     Hartford's internal note, dated July 25, 2012, documents that an EAR was completed.  Hartford provides:

> Although[] the EAR was conducted and identified an alternative occupation as a Sales Representative which is listed as a light occupation, CAR RCM Bryant advised that a Labor Market Survey (LMS) is needed.  He stated that the identified occupation requires extensive travel and demonstration of products/equipment which are essential duties.  He advised that due to the claimant's current lifting restriction of 10 pounds occasionally and 5 pounds frequently, employability cannot be established definitively and a LMS should be done to determine if the occupation can be performed with the current lifting restrictions.

88.     Hartford's internal note, dated August 27 2012, documents that an LMS was completed.  Hartford provides:

> CAR RCM Bryant advised that upon review of the LMS, 9 out of 16 employers advised that the occupation was at a medium physical demand level and 7 out of 16 employers classified the occupation at a light physical demand level.  CAR RCM Bryant noted that the claimant's restrictions give him a modified light level of function with restrictions to lifting/carrying.  <u>It is noted that there were no alternative occupations that meet his required gainful earnings at a sedentary level</u>.

(Emphasis added).

89.     The claim file questionably does not contain a copy of Hartford's EAR and/or LMS supporting Gottlieb's disability and inability to perform any occupation.

90.     Hartford's internal note, dated August 29, 2012, documents Hartford's determination to continue Gottlieb's LTD claim based on the results from the CIU investigation. Hartford provides:

. . .Based on the lack of identified alternative occupations, the claimant continues to meet his policy's definition of Disability at this time. CIU will close its review of his LTD claim at this time as no additional evidence warranting a continued review was identified. A review of the Premium Waiver claim will be continued. Advised CAR AA Mancini.

*Hartford's Discontinuation of Gottlieb's Waiver of Premium Benefits*

91.     Contrary to Hartford's determination to continue Gottlieb's LTD benefits, Hartford's internal note, dated September 13, 2012, documents that David Chung, identified as a Manager, "agree with termination as updated info no longer supports that EE meets the policy def[inition] of disability."

92.     On or about September 14, 2012, Mr. Dennis, Hartford's Investigative Analyst, informed Gottlieb of Hartford's determination to discontinue his Waiver of Premium benefits under the Life Policy after approving his Waiver of Premium benefits for over four (4) years.

93.     Hartford's 9/14/12 discontinuation was based on cherry picked "evidence" obtained by the CIU, including but not limited to: video surveillance; interview with Hartford's investigator; file reviews by Medical Case Managers; and medical examination.

94.     Contrary to Mr. Dennis' representation that Hartford's 9/14/12 discontinuation was based "on Policy Language and all documents contained in your Long-Term Disability claim, viewed as a whole," Hartford's 9/14/12 discontinuation letter contained no reference to the vocational reviews by the Rehabilitation Case Managers supporting Gottlieb's continuing disability and inability to perform any occupation under the LTD Policy.

95.     There is no indication in the claim file that Hartford considered whether Gottlieb could perform any work based on his "education, experience, and training" under the terms of the Life Policy.

96.     Hartford provided Gottlieb with the right to convert his Life Policy, but he was unable to covert due to the financial constraints posed by his continuing disability and inability to work in any capacity.

97.     On or about October 3, 2012, the undersigned requested a copy of Gottlieb's claim file, including but not limited to:

(3)     All documents:
(i)     relied on in making the benefit determination, including without limitation, all reports, notes, records, test results, correspondence and curriculum vitae of any independent medical examiner/reviewer, functional capacity evaluator, transferable skills expert, and/or vocational expert. . .

98.     Hartford provided the undersigned with what it purported to be the complete claim file, but a close review of the claim file revealed that the EAR and LMS studies supporting Gottlieb's continuing disability were missing.

*Gottlieb's Continuing Disability and Onset of Pancreatic Condition*

99.     On or about January 15, 2013, Gottlieb was admitted to Huntington Hospital for three days with upper left quadrant pain, where he was treated for acute pancreatitis.

100.    Gottlieb underwent an MRI and CT scan of the abdomen and pelvis, which revealed a soft tissue mass in the tail of the pancreas.

101.    On or about February 25, 2013, Gottlieb underwent resection of a pancreatic neuroendocrine tumor with open splenectomy performed by Peter Allen, M.D., at Memorial Hospital for Cancer and Allied Diseases.

102.    Gottlieb's post-operative diagnosis was noted as malignant neoplasm pancreas NOS (ICD-9 Code: 157.9).

103.    On or about March 1, 2013, a surgical pathology report revealed a well differentiated pancreatic neuroendocrine tumor with an elevated proliferative rate (40% Ki67

labeling index).

104.    Gottlieb's pancreatic neuroendocrine tumor was grades as T3N1 indicating metastasis to 1 lymph node.

105.    Gottlieb's pancreatic neuroendocrine tumor was noted to be 6cm with infarct type necrosis.

*Gottlieb's Appeal of Hartford's Discontinuation of Waiver of Premium Benefits*

106.    On or about April 12, 2013, Gottlieb appealed Hartford's 9/14/12 discontinuation of his Waiver of Premium benefits under the Life Policy.

107.    Gottlieb submitted substantial vocational and medical evidence demonstrating his inability to work in any capacity due to his disabling conditions, including but not limited to: (a) Vocational Analysis completed by Kathryn Reid, MA, CRC, CCM, dated February 21, 2013; (b) Functional Capacity Evaluation (FCE) completed by Susan Greenberg, MS, PT, on September 21 & 22, 2012, including an Addendum Report, dated April 3, 2013; and (c) functional capacity questionnaire, narrative reports, and updated medical records from Dr. Schwartz supporting Gottlieb's continuing disability and inability to work in any capacity.

Vocational Analysis by Reid Supports Disability

108.    On or about January 4, 2013, Gottlieb underwent a Vocational Analysis with Kathryn Reid, MA, CRC, CCM, to analyze his current functional status and ability to work.

109.    Consistent with Hartford's RCM and Dr. Schwartz, Reid opined that Gottlieb's "back condition is a severe disability which prevents him from performing any type of work, even sedentary, on either a full-time of a part-time basis." Reid further provides:

> Even within a hypothetical office environment, with the ability to change positions as needed, Mr. Gottlieb does not have the work tolerance for any full-time employment. He does not have the education, training, or experience for any work that is entirely sedentary. In spite of his education,

training, and experience as an RN, he does not have clinical experience within the last 30 years and, therefore, would not be employable. He would need significant additional education and training to become qualified for any type of alternate work in any sales or medical capacity.

<u>Functional Capacity Evaluation Objectively Substantiates Disability</u>

110.    Gottlieb underwent a two-day Functional Capacity Evaluation (FCE) administered by Susan Greenberg, MS, PT, on January 24 & 25, 2013, to assess his physical capacity to work.

111.    Consistent with Dr. Schwartz, Greenberg opines that the results from the two-day FCE objectively substantiated Gottlieb's continuing disability and inability to work. Greenberg provides:

> Mr. Gottlieb is still suffering from stiffness of the spine and lower extremities with radiculopathy, as well as lower extremity weakness with aggravation of these symptoms in a variety of positions and tasks, especially with static sitting. He moves with caution so as not to provoke his symptoms. He also experiences difficulty with strong hand gripping and hand coordination efforts due to increased low back pain from the seated testing position, which is required for these tasks. This was more apparent on the second day of testing when low back pain had increased.
>
> Mr. Gottlieb is currently unable to function at the sedentary physical demand level due to the high level of dysfunction caused by the by [sic] his symptoms of aching and burning lower back pain, radiating left leg pain to the knee, and right lower extremity pain and frequent episodes of shortness of breath. He is also not able to tolerate an 8-hour work day due to positional intolerances in sitting (and to a lesser extent standing, as well as increased fatigue and deterioration of movements as tasks progress).

112.    In her Addendum Report, dated April 3, 2013, Greenberg opined that the surveillance video footage obtained by Hartford were not inconsistent with the January 24 & 25 2013 FCE specifically noting that she reviewed the video footage. Greenberg provides:

> In the beginning of the video, Mr. Gottlieb sits with a male friend outside on what appears to be a chaise lounge. Most of the time, a full view of Mr. Gottlieb is obscured by the column he is sitting behind. Although he appears to remain seated from 10:00 until 10:55, he is noted to be stretching

frequently (e.g., reaching hands overhead). This was generally consistent with his FCE abilities, where he was able to tolerate sitting for approximately 20 minutes with fidgeting, stretching, and/or shifting positions.

In the next section of the video, Mr. Gottlieb is seen walking into a store and then in a Marina with his friend. This ability is consistent with his demonstrated ability to walk 1% to 5% of the day.

In the final section of the video, Mr. Gottlieb is seen getting onto a boat. He is observed pulling himself up and leaning heavily on his arms to do so. This is generally consistent with his method of climbing stairs observed during the FCE. To negotiate the stairs, he held both banisters and pulled himself up primarily using his arms. He is also noted during this segment to be forward bending briefly, also consistent with his demonstrated FCE ability to do so on an occasional basis.

Dr. Schwartz Substantiates Gottlieb's Continuing Disability and Inability to Work

113. Dr. Schwartz continued to maintain his medical opinion that Gottlieb remained disabled due to his persisting symptoms of pain in the lower back and lower extremities, which precluded his ability to perform work in any capacity.

114. In his Back Residual Functional Capacity Questionnaire, dated January 6, 2013, Dr. Schwartz assessed Gottlieb's functional capacity, where he confirmed his inability to work any occupation due to his diagnoses of postlaminectomy lumbar (722.83) and sciatica (724.3).

115. Dr. Schwartz assessed Gottlieb's functional capacity as follows: sit for 30 minutes at a one time, less than 2 hours total in an 8-hour work day; stand/walk for 30 minutes at one time, less than 2 hours total in an 8-hour work day; require unscheduled breaks every half hour during an 8-hour work day; require period of walking every half hour for 10 minutes during an 8-hour workday; lift/carry less than 10 lbs. 1-10% during an 8-hour work day; twist, stoop (bend), crouch/squat 1-10% during an 8-hour work day.

116. Dr. Schwartz noted that Gottlieb's pain was substantiated by positive objective signs, including: reduced range of motion; positive straight leg raise test bilaterally;

abnormal gait; right foot sensory loss; lower back tenderness; muscle spasm; impaired appetite or gastritis; and intermittent impaired sleep.

117. Dr. Schwartz noted that Gottlieb suffers from constant pain severe enough to interfere with attention and concentration needed to perform even simple work tasks.

118. In his Narrative Report dated April 4, 2013, Dr. Schwartz detailed his 10+ year longitudinal treatment history of Gottlieb and affirmed his medical opinion that he "has a severe lumbar spine problem and is clearly 100% disabled from continued employment in any job whatsoever." Dr. Schwartz provides:

> Mr. Gottlieb does have a healed fusion and symptomatology associated with post-laminectomy syndrome with epidural fibrosis. Mr. Gottlieb is unable to attend to a full-time job, which would require energy, concentration or regular attendance. He complains of severe pain and needs to be able to rest as well as be up moving around in order to have any resolution of his symptoms. As you can see, I have seen Mr. Gottlieb for many visits over the past 10 years where he has nursed along his lower back problems and it is unfortunate that he did not recover sufficiently enough to ever return to work. I have personally witnessed him in pain suffering severely with back and leg pain.
> [. . .]
> There is no doubt in my mind that Mr. Gottlieb is incapable of comfortably performing sedentary work. This specifically is in reference to the fact that Dr. Thampi believes that Mr. Gottlieb can sit for an eight-hour day or stand or walk four hours in the day or even lift, carry, push or pull 10 pounds on an occasional basis.

119. In his Narrative Report, dated April 9, 2013, Dr. Schwartz opined that the video surveillance obtained by Hartford "does not validate [Gottlieb] to be able to work at all" specifically noting that he reviewed the surveillance videos. Dr. Schwartz provides:

> . . .I reviewed the videotape. It shows approximately 1 minute and 40 seconds of Marc trying to get onto the boat, which he did with difficulty and then apparently changed the bulb, although that is not very clear to me on review of this video surveillance.
>
> Whereas Mr. Gottlieb went on the boat, it is clear to me that even trying to get onto the boat, he had extreme difficulty. More importantly is that this video of no more

than 1 minute and 40 seconds of him getting onto the boat is far from the reality of him working a full day in any position.  I continue to find it unconscionable that Dr. Thampi could extrapolate that Mr. Gottlieb could work based on this information.

*File Review and Addendum by James A. K. Lambur, M.D. of UDC*

120.    On or about June 3, 2013, Hartford referred Gottlieb's claim file to University Disability Consortium ("UDC") for file reviews from an orthopedic and internal medicine perspective.

121.    The "Medical Consultant – Referral Form" specifically instructed the UDC file reviewers to <u>not</u> contact Gottlieb's treating providers telephonically and that questions for the treating providers should be "put in writing and sent to the physicians. . ."

122.    On or about June 19, 2013, Dr. Lambur of UDC completed a file review of Gottlieb's medical records from an orthopedic perspective.

123.    Dr. Lambur inexplicably assessed Gottlieb's restrictions and limitations as follows:  "From an orthopedic perspective, restrictions would include no lifting over 10 pounds, sitting 6 hrs per day out of an 8 hour period, no standing/walking in excess of 4 hours our of an 8 hour period and there is no contra-indication to fingering and/or handling nor is there any contra-indication to occasional activities requiring above shoulder reaching."

124.    Dr. Lambur concludes:  "It is the opinion of this reviewer that Mr. Gottlieb is well able to sustain full time 40 hour a week employment on a consistent and reliable basis in a competitive market at the sedentary level."

125.    Dr. Lambur further noted that he called Dr. Schwartz on June 16, 2013, despite explicit instructions from Hartford <u>not</u> to contact Gottlieb's treating providers telephonically.

126.    Dr. Lambur acknowledged that he did not review Hartford's surveillance

videos, but inexplicably concludes that Gottlieb's "activity entering and exiting boats on an unstable surface requires modicum of agility."

127.    Dr. Lambur incorrectly notes that Gottlieb was observed "entering and exiting boats," but Gottlieb was observed on one (1) boat owned by a friend for less than two (2) minutes.

128.    It is questionable how Dr. Lambur was able to assess that Gottlieb was "on an unstable surface" without actually observing the surveillance videos.

129.    Dr. Lambur incorrectly noted that: "Discussion with Mr. Gottlieb's attending physician Dr. Schwartz states he has been acquainted with Mr. Gottlieb for many years and Mr. Gottlieb's wife continues to be employed in Dr. Schwartz' operating room."

130.    On or about June 19, 2013, Dr. Lambur provided his "summary" of the June 16, 2013 telephone call for Dr. Schwartz' review and comments.

131.    On the same day, Dr. Schwartz prepared an email to Dr. Lambur noting that "there were many inaccuracies in [Dr. Lambur's] summation."

132.    Dr. Schwartz corrected Dr. Lambur's inaccurate description of Dr. Schwartz' relation to Gottlieb and Plaintiff.  Dr. Schwartz provides:

> First, I'd like you to be aware that Marc Gottlieb is not my acquaintance.  He has been a patient of mine for greater than 10 years.  I have never socialized with him or his spouse who used to work in the operating room at the hospital that I have worked primarily at for greater than 28 years.  I don't recall the last time I saw her in the operating room at Huntington Hospital; so I do not know how you came up with the line in your report that she works in my operating room.  Even if she did, that would mean nothing with respect to Marc's ongoing disability.  One thing has nothing to do with the other.

133.    Dr. Schwartz corrected Dr. Lambur's inaccurate description of Gottlieb's disabling condition and reiterated he did not have the functional capacity to perform work even at

the sedentary level.  Dr. Schwartz provides:

> You go on to state that Mr. Gottlieb has a mild "failed back syndrome."
> This can't be further from the truth.  I totally disagree with this statement.  I
> think I said I wish he had a "mild failed back syndrome".  Once again you
> did not hear what I had to say.  Furthermore, there is no way that Mr.
> Gottlieb could ever 'function at a minimum of a sedentary level'.

134.   Dr. Schwartz disagreed with Dr. Lambur's conclusion that there is a

"paucity" of physical findings noting findings from his direct examination of Gottlieb.  Dr. Schwartz

provides:

> You further state that there is a 'paucity' of physical findings.  You really
> can't say that since you have never examined Mr. Gottlieb.  I thought I made
> myself perfectly clear; but apparently, you have a different concept of his
> physical findings.  I stated that he had rather severe root tension signs on a
> regular basis and as recent in his office visit with me on 4/22/13, he had
> weakness of his left foot dorsiflexor at 4/5.  Would you agree with me that
> weakness or nerve root tension signs are not a 'paucity' of findings?

135.   Dr. Schwartz corrected Dr. Lambur's inaccurate description of Gottlieb's

treatment and medication regimen.  Dr. Schwartz provides:

> . . .Dr. Lambur. . . .Ultram is classified as a Schedule IV controlled substance
> in New York State.  It used to be considered a non-narcotic. . .but no longer
> is it considered that according to the New York State Public Health Law
> which took effect earlier this year.  It is a controlled substance.  It is "a
> centrally acting synthetic analgesic used to treat moderate to moderately
> severe pain".  Tramadol induced serotonin release while inhibiting the
> reuptake of norepinephrine.  Please don't minimize Mr. Gottlieb's pain.  He
> used Norco 10/325 from time to time as well.

136.   Dr. Schwartz provided Dr. Lambur with his credentials specifically noting

the frequency of his direct examination and treatment of patients with spinal disabilities.  Dr.

Schwartz provides:

> . . .I have been in practice as an orthopedic spine specialist for over 28 years.
> I continue to see patients everyday.  I operate 2-3 days/week doing only
> spinal surgery.  I have been recertified by the American Board of Orthopedic
> Surgery twice.  I am a member of NASS and other spine organizations.

137.    Dr. Schwartz concludes by vehemently reiterating that he disagreed with Dr. Lambur's 6/19/13 file review and 6/19/13 "summary" of the 6/16/13 telephone call.    Dr. Schwartz provides:

> In my professional opinion, it is quite unfortunate, that with all of your experience, that you could even offer an opinion like this after reviewing his entire medical record of +10 years and the conversation that we had.  I hope that you truly did review ALL of my notes before you came to the conclusions that you did.  Furthermore, I challenge you to come to my office and examine Mr. Gottlieb to truly give an independent unbiased medical opinion. . .
> [ . . .]
> I disagree wholeheartedly with your conclusion that you came to with respect to Mr. Gottlieb's disability.

138.    On or about June 24, 2013, Dr. Lambur completed an Addendum in response to Dr. Schwartz' 6/19/13 response.

139.    Despite Dr. Schwartz' detailed response, Dr. Lambur merely stated that he "reported accurately" his conversation with Dr. Schwartz and maintained his opinion that Gottlieb was able to engage in a sedentary occupation.

*File Review by Robert Cooper, M.D. of UDC*

140.    On or about June 19, 2013, Dr. Copper of UDC completed a file review of Gottlieb's medical records from an internal medicine perspective.

141.    Dr. Cooper acknowledged the excision of Gottlieb's pancreatic neuroendocrine tumor and assessed his restrictions and limitations as follows:  "For the time period 02/25/2013 through 04/30/2013, the claimant was not able to perform work at any level of activity."

142.    Dr. Cooper did not consider the impact the pancreatic neuroendocrine tumor would have on Gottlieb in light of the surgical pathology report, which revealed among other findings, the tumor staging as T3N1.

143. Dr. Cooper deferred to Dr. Lambur's flawed file review with respect to Gottlieb's orthopedic issues.

144. There is no indication that Hartford provided Drs. Lambur and Cooper with the FCE administered by Greenberg, which objectively substantiated deficits in Gottlieb's functional capacity and inability to perform occupations at the sedentary level.

145. The file reviews completed by Drs. Lambur and Cooper are silent with respect to the FCE.

*Hartford's Appeal Denial of Gottlieb's Waiver of Premium Benefits*

146. On or about July 1, 2013, Judith Rose, Appeal Specialist, informed Gottlieb of Hartford's determination to uphold the discontinuation of his Waiver of Premium benefit.

147. Hartford moved the goal posts. After it knew that Gottlieb would not have an opportunity to present additional evidence, for the first time during the administration of Gottlieb's claim, Hartford noted that Gottlieb must be precluded from performing work on a full or part-time basis in order to satisfy the definition of "Disabled" under the Life Policy. Hartford's 7/1/13 appeal denial letter provides:

> Please note that in order to satisfy the policy definition of Disabled, as it applied to Waiver of Premium benefits, you must be prevented from doing *any work*. Therefore, if you retained any capacity to work, either full or part-time, then this would preclude your entitlement to Waiver of Premium benefits.

148. Hartford's 7/1/13 appeal denial letter indicates that Dr. Schwartz originally assessed Gottlieb's restrictions and limitations in a Physical Capacities Evaluation (PCE) Form completed on November 16, 2010, which were allegedly consistent with at least part-time sedentary to light work.

149. In his 11/16/10 PCE, Dr. Schwartz assessed Gottlieb's restrictions and

limitations as follows:  sit ½ hour at a time, 2 hours total in a work day; stand 1 hour at a time, 2 hours total in a work day; walk ½ hour at a time, 2 hours total in a work day; lift/carry/push/pull 1-10 lbs. 1-33% in a work day.

150.    Hartford overlooked the fact that Dr. Schwartz' assessment of Gottlieb's restrictions and limitations since the onset of Gottlieb's disability have been consistent with the 11/16/10 PCE.  For example:

| DATE | SIT | STAND | WALK | LIFT/CARRY |
|------|-----|-------|------|-----------|
| 11/16/10 | ½ hr, at a time 2 hrs, total | 1 hr, at a time 2 hrs, total | ½ hr, at a time 2 hrs, total | 10 lbs., 1-33% |
| 6/25/09 | ½ hr, at a time 2 hrs, total | 1 hr, at a time 2 hrs, total | ½ hr, at a time 2 hrs, total | 10 lbs., 1-33% |
| 6/24/08 | ½ hr, at a time 2 hrs, total | 1 hr, at a time 2 hrs, total | ½ hr, at a time 2 hrs, total | 10 lbs., 1-33% |
| 2/15/08 | ½ hr, at a time 2 hrs, total | 1 hr, at a time 2 hrs, total | ½ hr, at a time 2 hrs, total | 10 lbs., 1-33% |
| 11/13/07 | ½ hr, at a time 2 hrs, total | 1 hr, at a time 2 hrs, total | ½ hr, at a time 2 hrs, total | 10 lbs., 1-33% |

151.    There is no indication in the claim file why Hartford now takes issue with the restrictions and limitations assessed by Dr. Schwartz in his 11/16/10 PCE after approving Gottlieb's Waiver of Premium benefits for over <u>four</u> years.

152.    Dr. Schwartz further opined Gottlieb was "disabled + unable to work."

153.    There is no indication in Hartford's 9/14/12 termination letter that Hartford took issue with the restrictions and limitations assessed by Dr. Schwartz' 11/16/10 PCE.

154.    There is no indication in Hartford's 9/14/12 termination letter that Hartford interpreted the restrictions and limitations assessed by Dr. Schwartz were "consistent with at least part-time sedentary to light work. . ."

155.     Hartford's 7/1/13 appeal denial placed undue reliance on the flawed file reviews completed by Drs. Lambur and Cooper of UDC.

156.     Harford inexplicably concludes that "[t]he weight of the evidence available for review supports that Mr. Gottlieb is able to perform some degree of work, if only on a part-time basis."

157.     Hartford's asserts that the EAR and LMS supporting Gottlieb's continuing disability and inability to work under the LTD Policy were not included in his claim file because these vocational assessments were "not obtained in the course of making a determination on Mr. Gottlieb's Waiver of Premium claim. . ."

158.     Hartford, however, selectively relied on flawed "evidence" allegedly supporting the discontinuation of Gottlieb's Waiver of Premium benefits (*i.e.*, surveillance videos, interview with Hartford's investigator; MCM reviews), which were obtained during the same LTD investigation that was used to obtain the EAR and LMS.

159.     Hartford failed to identify any work Gottlieb could allegedly perform on a full or part-time basis based on his "education, training or experience" under the terms of the Life Policy.

160.     Hartford acknowledged the undersigned's request to respond to Hartford's medical or vocational reviews prior to rendering a decision with respect to his appeal, but Hartford declined to do so stating that there "*may* be unnecessary delays which prevent us from reaching an appeal decision within the timeframes allotted under ERISA."  (Emphasis added).

161.     Hartford did not make the effort to see whether the undersigned would be willing to stipulate to an extension of the ERISA deadlines in order to provide Gottlieb with a full and fair review of his appeal.

162.     Gottlieb has complied with and exhausted all administrative appeals under the Life Plan.

*Hartford Continued to Pay Gottlieb's LTD Benefits*

163.    Contrary to Hartford's determination to discontinue Gottlieb's WOP benefits, Hartford continued to pay Gottlieb his LTD benefits under the "any occupation" definition of disability.

164.    In or about August 2013, Gottlieb was informed that there had been an unequivocal progression and reoccurrence of metastatic disease to his liver.  A copy of Gottlieb's medical records from Memorial Hospital for Cancer and Allied Diseases is attached as **EXHIBIT B.**

165.    Despite undergoing aggressive treatment (*e.g.*, chemotherapy and embolizations of the right and left hemi-liver) at Memorial Hospital for Cancer and Allied Diseases, Gottlieb continued to suffer from progression of disease.

166.    In or about April 2014, Gottlieb was diagnosed with diabetes due to his worsening pancreatic function due to stage 4 pancreatic neuroendocrine tumor.

167.    In or about April 2014, Gottlieb was advised that his prognosis was less than 3 months and that the goal was to provide ongoing support and end of life symptom management until his death.

168.    In or about April 2014, Gottlieb became eligible for Waiver of Premium benefits under the Life Policy because he was "diagnosed with a life expectancy of 12 months or less."

169.    Within a mere 5 months after the progressions and reoccurrence of his disease, Gottlieb died on September 18, 2014.

170.    Hartford paid Plaintiff Gottlieb's final LTD benefit through his date of death on September 18, 2014, including Survivor Benefits.

## HARTFORD'S CONFLICT OF INTEREST

171.     At all relevant times, Hartford has been operating under an inherent and structural conflict of interest because, on the one hand, Hartford is liable for benefit payments due to Plaintiff and, on the other hand, each such payment depletes Hartford's assets.

*Hartford's Cozy Relationship with UDC and ICS Merrill*

172.     Hartford knows, or has reason to know, that UDC and ICS Merrill serve only insurance companies and never individual claimants.

173.     UDC holds itself out to the general public as a company that provides services related to administering medical examinations and file reviews among services for which it receives direct payment.

174.     Upon information and belief, Hartford pays UDC substantial sums of money to provide file reviews for Hartford insureds.

175.     In the past, as well as in this case, Hartford extensively utilized the services of UDC.  In 2005, UDC performed 2,517 medical record reviews on behalf of Hartford, charging $3,558,187.  In 2006, UDC performed 1,774 medical record reviews on behalf of Hartford, charging $2,515,168.  In 2007, UDC performed 893 medical record reviews on behalf of Hartford, charging $1,272,128.

176.     Upon information and belief, Hartford is an important client of UDC accounting for a substantial percentage of their annual revenue.

177.     In the past, as well as in this case, Hartford utilized the services of UDC, to whom Hartford has paid over $13 million for review services over approximately four years.  "It follows that Hartford knows that UDC has an incentive to provide it with reports that will increase the chances that Hartford will return to UDC in the future--in other words, reports upon which

Hartford may rely in justifying its decision to deny benefits to a Plan participant." *Caplan v. CNA Financial Corp.*, 544 F.Supp.2d 984, 991-92 (C.D. Cal. 2008).

178.    UDC "is a company that, as of 2006, derived nearly three quarters of its revenue from defendant" Hartford. *Jacoby v. Hartford Life and Acc. Ins. Co.*, 2008 WL 4361256, at *1 (S.D.N.Y., Sep. 24, 2008).

179.    Because Hartford provides substantial revenue to UDC, it has an incentive to provide Hartford with reviews that Harford deems favorable in order to preserve Hartford as a client.

180.    Hartford's selection of medical review companies such as UDC in this case shows that Hartford does not try to fairly and accurately evaluate claims, but instead that it selects medical review companies and their doctors who will provide expected results (*i.e.*, a finding that the insured is not impaired).

181.    Hartford limits its employees to certain medical review companies they may use for evaluations of medical issues.

182.    Upon information and belief, ICS Merrill holds itself out to the general public as a company that provides services related to obtaining video surveillance among services for which it received direct payment.

183.    ICS Merrill's website provides:  "Insurance fraud ranks second behind tax evasion as the most prevalent white-collar crime in the United States – costing billions in lost revenue and increasing premiums every year.  [. . .]  More than 30 major insurance companies trust ICS Merrill to handle all of their Special Investigations Unit services."[2]

---

[2] ICS Merrill company website, accessed Apr. 7, 2015 (http://www.emsinet.com/Investigative.aspx).

*Hartford's Cozy Relationship with Drs. Lambur and Cooper*

184.   Prudential knows, or has reason to know, that the medical consultants retained by UDC to complete file reviews serve only insurance companies and never individual claimants.

185.   Through UDC, Hartford pays Dr. Lambur and Cooper substantial sums of money to provide file reviews for Hartford's insureds.

186.   Because the medical consultants derive substantial income for performing file review for Hartford's insureds, each has an incentive to provide file reviews that Hartford deems favorable in order to perform future file reviews for Hartford's insureds.

187.   The medical consultants that Hartford approves provide significantly more file reviews than actual examinations of Hartford's insureds.

188.   Dr. Lambur's file reviews have been criticized by the court as "error-ridden, internally inconsistent, and lacking in any real analysis." *See, e.g., Demaree v. Life Ins. Co. of N. Am.*, 789 F. Supp. 2d 1002, 1019 (S.D. Ind. 2011).

189.   Dr. Lambur has also been criticized by the court for "morph[ing]" the contents of his telephonic conversations with treating physicians in his written "summaries." *See, id.*, at 1016.

*Hartford Focuses Its Employees on Claims Outcomes*

190.   Hartford instructs its employees to aggressively manage all claims to achieve "Outcomes" or "RTW"s.

191.   "Outcomes" and "RTW" (return to work) are euphemisms unique to Hartford that often equate with a cessation of Hartford paying benefits to an insured.

192.   Under Hartford's practices, "RTW" does not mean that an insured actually

returned to work at a past employer or new employer.

193.    Hartford has the ability to track all claims and review specific claims reserves attributable to a particular insured through databases that can be viewed through Claims Outcome Tracking ("COT") and COMPASS.

194.    If a Hartford employee starts tracking a claim in COT, that employee is charged with reaching an "Outcome" to signify the results of that employee's intervention in achieving "RTW".

195.    "COT records all Actions and Outcomes in cases where the claim is managed aggressively to an early RTW."  This is set forth in the Hartford "Clinical Orientation Program Manual," which is attached **EXHIBIT C**.

196.    Lower level claims personnel have access to COTS as do senior management.

197.    Hartford codes high indemnity claims with a special notation to identify these claims for special scrutiny.  An example of a claim that has been marked for scrutiny is attached as **EXHIBIT D**.

198.    Hartford employees have a monetary incentive to achieve "Outcomes" or "RTW."

199.    At times, Hartford uses COT to set targets for resolving pending claims. Examples of the COT targeting are set forth on the attached **EXHIBIT E**.  **doc 2981, 2984**.

200.    Employees have been known to alert their supervisors if an employee is not credited with a sufficient number of "RTWs" or "Outcomes."   An example of an employee complaining that she was not credited with all of the "RTWs" that she accomplished is set forth on the attached **EXHIBIT F**.  **doc 2987, 3008**.

201.    Sometimes employee performance appraisals identify the specific sums of claims reserves that an employee has saved Hartford.  Examples of these practices are set forth on the attached **EXHIBIT G**. **doc 2989, 2994, 2999, 3004, 3384, 3391 (targets), 3414, 3456**.

202.    Hartford employees pay special scrutiny to claims that may cause Hartford to pay benefits for a long period of time, depleting Hartford's assets.  An example of this practice is set forth on the attached **EXHIBIT H**. **doc 3244**.

*Hartford Provides Monetary Incentives to Employees*

203.    Hartford not only pays salary to its claims personnel, but also depending on the employee's level, the employee may be eligible for either a Business Performance Award ("BPA") or an Individual Performance Award ("IPA") or both.  A copy of each award program is attached herewith as **EXHIBIT I**.

204.    Hartford has other bonus programs available to claims employees, including one called Annual Incentive Program ("AIP").

205.    BPA's are based on the profitability of the Group Benefits Division.

206.    IPA's are awarded at the discretion of the manager based upon the performance of the employee.

207.    Employees that save Hartford money by terminating or denying claims are more likely to be rewarded with bonuses than those who do not.

*Hartford Conducts Contests to Promote Claim Denials*

208.    Hartford holds contests whereby its claims and/or rehabilitation personnel are encouraged to deny or terminate claims.

209.    An example of such a contest was held in Summer 2006 and was informally known as "summer splash contest."  The summer splash contest is described in **EXHIBIT G, doc**

**3456**.

*Hartford Has Not Reduced Its Conflict of Interest*

210.    Hartford has failed to take active steps to reduce potential bias and to promote the accuracy of its benefit determinations.

211.    Hartford does not maintain an independent appeals unit.  The head of appeals unit, reports directly to the Assistant Vice President of Risk Management, who reports directly to the Vice President of GBD Claims.  Accordingly, appeals is subordinate to claims.

212.    Hartford's claims unit is not independent from financial operations.  The Assistant Vice President of Financial Operations has a dotted line reporting relationship to the Vice President of GBD Claims.

## COUNT I

213.    Plaintiff incorporates those allegations contained in paragraph 1 through 212 as though set forth at length herein.

214.    Hartford's discontinuation of Gottlieb's Waiver of Premium benefits under the Life Plan was premised on Hartford's erroneous interpretation of "any work," which is <u>not</u> a term that is defined in the Life Plan.

215.    Hartford had no legal basis for discontinuing Gottlieb's Waiver of Premium benefits under the Life Plan.

216.    Hartford's determination that Gottlieb is not totally disabled within the meaning of the Life Plan is contrary to the terms of the Life Plan, contrary to the medical evidence, unreasonable, and an abuse of discretion.

217.    Under the terms of the Life Plan, Hartford agreed to provide Gottlieb with certain life insurance benefits in accordance with the terms and conditions set forth therein.

218.  To date, Hartford has failed and refused to continue Gottlieb's life insurance coverage under a waiver of premium from September 14, 2012 to date of his death.

219.  To date, Hartford, failed to pay Plaintiff the benefits to which she is rightfully entitled under the Life Plan from September 18, 2014 to present.

220.  Gottlieb satisfied all conditions precedent under the Life Plan and was thus eligible for continuing life insurance coverage under a waiver of premium from September 14, 2012 to the date of his death. Thus, Gottlieb's beneficiary, Plaintiff, was entitled to benefits under the Life Plan on September 18, 2014.

221.  Hartford has financial conflicts of interest with respect to handling, monitoring and eventually discontinuing Gottlieb's Waiver of Premium benefits.

222.  Hartford was influenced by its financial conflict of interest, as both the administrator of the Life Plan and the payor of benefits thereunder, when deciding to terminate Gottlieb's Waiver of Premium benefits.

223.  The unlawful behavior of Hartford is evidenced by the following:

a)  Discontinuing Gottlieb's coverage under the Life Plan at a time when they knew that he was entitled to said benefits under a waiver of premium, in bad faith and contrary to the Life Plan;

b)  Discontinuing Gottlieb's coverage under the Life Plan knowing his claims for continuing coverage under the Life Plan was valid;

c)  Unreasonably discontinuing Gottlieb's coverage under the Life Plan without having any evidence, substantial or otherwise, supporting its decision to discontinue benefits;

d)  Completely disregarding Gottlieb's treating physicians' assessment of his medical condition and how it restricts and limits him from performing any work without any basis for doing so;

e)  Selectively highlighting certain factors in medical reports in order to cast a favorable light on its position while ignoring the

conclusions of Gottlieb's treating physicians regarding the conditions for which they render treatment;

f) Completely disregarding Gottlieb's own assessment of his medical condition and how it restricts and limits him from performing any occupation and/or any work;

g) Completely disregarding the assessment of Gottlieb's eyewitnesses about his deteriorating physical condition and how it restricts and limits him from performing any occupation, any work, and/or routine daily tasks;

h) Engaging in a pattern of procedural irregularities to advance its own personal interests in terminating benefits, to the detriment of Life Plan participants;

i) Improperly refusing to provide information relevant to the denial determination, which it was obligated to provide pursuant to 29 C.F.R. § 2560.503(g), in violation of ERISA;

j) Failing to maintain and utilize "reasonable claims procedures" as it was obligated to do pursuant to 29 CFR § 2560.503-1(b), in violation of ERISA;

k) Consistently acting in its own personal interests instead of those of the Life Plan and its participants;

l) Consorting with UDC to influence medical consultants hired to allegedly prepare impartial reports which were in actuality a joint effort by Hartford and UDC staff and the physicians;

m) Improperly discontinuing Gottlieb's life insurance coverage under the Life Plan without any information that his condition had improved from the time Hartford determined that Gottlieb satisfied the definition of "Disabled" under the Life Plan; and

n) Improperly refusing to review medical documentation pertinent to Gottlieb's condition.

224.    Hartford breached its fiduciary duty by failing to fairly review and reasonably interpret the reports prepared by Gottlieb's treating and examining physicians and failing to consider material relevant to his medical condition.   Instead, Hartford created an artificial reason for discontinuing Gottlieb's Waiver of Premium benefits under the Life Plan.   Hartford selectively

highlighted certain factors in medical reports in order to cast a favorable light on its position while ignoring the conclusions of Gottlieb's treating doctors regarding the condition for which they rendered treatment.

225.    Hartford breached its fiduciary duty to Plaintiff and Gottlieb by placing its financial interests in reducing its expenses and increasing its profitability above Plaintiff and Gottlieb's interests under the Life Plan to receive life insurance benefits.

226.    A "higher than marketplace" quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008), applies to evaluating the actions of Hartford in this case.

227.    Hartford was required to discharge its duties "solely in the interests of the participants and beneficiaries of the plan."

228.    Hartford violated the higher-than-marketplace standards that ERISA imposes on insurers.

229.    As a direct and proximate result of the conduct alleged herein, Plaintiff has been damaged in an amount equal to the amount of benefits she would have received had Hartford continued Gottlieb's life insurance coverage under the Life Plan.

230.    Plaintiff has been forced to bring the instant action as a direct result of Hartford's unlawful discontinuation of Gottlieb's continuing life insurance coverage and violations of the Life Plan and ERISA.

231.    Under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), Plaintiff is entitled to recover life insurance benefits under the Plan that have not been paid to date, with interest.

## COUNT II

232.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 231

above.

233.    Gottlieb alternatively satisfied all conditions precedent under the Life Plan and was eligible for life insurance coverage under a waiver of premium on April 2014 because he was "diagnosed with a life expectancy of 12 months or less."   Thus, Gottlieb's beneficiary, Plaintiff, was entitled to benefits under the Life Plan on September 18, 2014.

234.    Given Hartford's conduct to date and the extent of Gottlieb's severe medical condition from April 2014 to date of death, administrative remedies would have been futile and unreasonable in light of Gottlieb's imminent death (i.e., less than 3 month life expectancy).

## COUNT III

235.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 234 above.

236.    By reason of Hartford's failure to pay Plaintiff life insurance benefits as due under the terms of the Life Plan, Plaintiff has been forced to retain attorneys to recover such benefits, for which Plaintiff has and will continue to incur attorney's fees.  Plaintiff is entitled to recover reasonable attorney's fees and the costs of this action, pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1).

WHEREFORE, Plaintiff demands judgment against Hartford:

A.    Clarifying and declaring that the Life Plan was obligated to cover Gottlieb with all life insurance coverage that he was entitled to receive, with a full waiver of premiums since September 14, 2012, or in the alternative, April 2014;

B.    For the amount of all life insurance benefits (*i.e.*, basic, supplemental, dependent benefits) payable to Plaintiff due under the terms of the Life Plan since September 18, 2014 that have not been paid, together with interest thereon;

C.   For the costs of this action and Plaintiff's attorney's fees, pursuant to Section

502(g) of ERISA, 29 U.S.C. § 1132(g); and

D.   For such other and further relief as may be deemed just and proper by the

Court.

Dated: New York, New York
        June 18, 2015

RIEMER & ASSOCIATES LLC
Attorneys for Plaintiff
60 East 42nd Street, Suite 1750
New York, New York  10165
(212) 297-0700
sriemer@riemerlawfirm.com

By: _____
        Scott M. Riemer (SR5005)

37